**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**POLLY A. SHATRAW,**

                                        **Plaintiff,**

        **v.**                                          **7:04-CV-0510**
                                                        **(NAM/RFT)**

**MICHAEL J. ASTRUE*,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

Conboy, McKay, Bachman & Kendall, LLP    Lawrence D. Hasseler, Esq.
407 Sherman Street
Watertown, New York 13601
_Attorney for Plaintiff_

Andrew T. Baxter                        William H. Pease, Esq.
Acting United States Attorney for        Sandra M. Grossfield, Esq.
the Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel                Barbara Spivak, Esq.
Social Security Administration
26 Federal Plaza
New York, New York 10278
_Attorneys for Defendant_

        ** On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social
        Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is
        automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in
        this action.

**NORMAN A. MORDUE, Chief U.S. District Judge:**

                **MEMORANDUM-DECISION AND ORDER**

**I.        INTRODUCTION**

Plaintiff Polly Shatraw brings the above-captioned action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny her application for Supplemental Security Income benefits ("SSI").  (Dkt. No. 1).  Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI on February 25, 2002.  (Administrative Transcript at p. 51-54).[1]  The application was denied on July 8, 2002. (T. 21).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on September 8, 2003. (T. 218-259).  On January 24, 2004, ALJ John M. Lischak issued a decision denying plaintiff's claim for benefits.  (T. 11-19).  The Appeals Council denied plaintiff's request for review on March 29, 2004, making the ALJ's decision the final determination of the Commissioner. (T. 6). This action followed.  On October 14, 2004, plaintiff filed a motion in support of inclusion of new medical evidence in the record.  (Dkt. No. 7).  The Court denied the motion by Order dated February 26, 2007. (Dkt. No. 10).

## III.    FACTUAL BACKGROUND

Plaintiff was born on August 27, 1966 and was 37 years old at the time of the administrative hearing on November 23, 2004. (T. 222).  Plaintiff is single and has 3 children ages 16, 13 and 10.  (T. 223-224).  Plaintiff resides with her boyfriend and her 10 year old son in a trailer. (T. 94, 224).  Plaintiff received her high school diploma in 1986 and completed two years of "food service" classes at a vocational school.  (T. 224).

---

[1] Portions of the administrative transcript, Dkt. No. 5, will be cited herein as "(T__)."

From October 2001 until February 2002, plaintiff was employed as a cashier at Big M Supermarket.  (T. 70, 228).  Prior to 2001, plaintiff worked various jobs including hotel housekeeper, secretary's helper and cook/cashier. (T. 229-233).  In 1996, plaintiff worked for six months as a telemarketer for Rain Soft. (T. 234).  As a telemarketer, plaintiff was required to frequently lift less than 10 pounds and was primarily in a seated position. (T. 234).  Plaintiff left Rain Soft when the company "went out of business". (T. 235).   Plaintiff's last day of employment, in any capacity, was February 8, 2002. (T. 51).  Plaintiff claims she became disabled due to a combination of physical and mental impairments including possible multiple sclerosis, disc herniation, osteoarthritis, degenerative disc disease and depression. (T. 15, 56).

A review of the record reveals that plaintiff was treated for her alleged disabling conditions by Roger Sullivan, M.D., George P. White, M.D., Stanley E. Grzyb, M.D., George Mina, M.D., Timothy M. Wiebe, M.D., Michael A. Horgan, M.D., Richard Smoot, M.D., and Harishanka Sanghi, M.D.  Plaintiff also received treatment in the emergency room of Massena Memorial Hospital, physical therapy at Massena Memorial Hospital and consulted with a therapist at St. Lawrence Psychiatric Center.

**A.**      **Plaintiff's medical treatment for neck and back pain**

On August 2, 1999, plaintiff treated with Dr. Roger Sullivan for complaints of neck pain that radiated into her right shoulder and paresthesia in her right arm.[2]  (T. 97).  Upon examination, Dr. Sullivan noted "neck remarkable for pain in the right shoulder". (T. 97).  Dr. Sullivan

---

[2] Paresthesia is an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus. *Dorland's Illustrated Medical Dictionary*, 1404 (31st ed. 2007).  The record does not indicate whether or not Dr. Sullivan specialized in any area of medicine.

diagnosed plaintiff with neck pain and prescribed Flexeril and Motrin.[3] (T. 97).

On August 11, 1999, plaintiff was examined by Dr. White, an orthopedist affiliated with Fletcher Allen Health Care in Vermont.  Plaintiff was referred to Dr. White by Robert Mitchell, an RPA.[4]  (T. 113).  Plaintiff complained of low back pain and bilateral lower extremity discomfort. (T. 113).  Dr. White noted that plaintiff had a "work-up for Multiple Sclerosis in the past and that this was negative".  (T. 113).  Upon examination, Dr. White noted no tenderness in plaintiff's lower back, pain on lower back extension more than flexion and no leg pain with maneuvers.  (T. 113).  Dr. White found that plaintiff's strength was 5/5 in the lower extremities with sensation and pulses intact. (T. 113).  Dr. White reviewed an MRI of plaintiff's lumbar spine and noted that a small herniation "does not appear to be impinging any of the nerve roots but does contact the theca".[5] (T. 113).  Dr. White discussed options with plaintiff which included a "wait and see" approach. (T. 114).  Dr. White recommended aerobic exercise, epidural injections or formal physical therapy. (T. 114).

On February 29, 2000, plaintiff was treated by Dr. Stanley Grzyb, an orthopedist affiliated with Fletcher Allen.  Plaintiff was referred to Dr. Grzyb by RPA Mitchell. (T. 115).  Dr. Grzyb noted that plaintiff had been evaluated by Drs. Monsey and White in the past.[6] (T. 115).  Dr. Grzyb reviewed plaintiff's lumbar MRI films (dated June 1999) and noted a small central

---

[3] Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Id*. at 465, 725.  Motrin is a nonsteroidal anti-inflammatory drug for the treatment of pain, fever, dysmenorrhea, osteoarthritis, rheumatoid arthritis, and other rheumatic and non-rheumatic inflammatory disorders.  *Id*. at 923, 1201.

[4] An RPA is a registered physicians assistant.  *Id*. at 2147. The record is devoid of any reports from RPA Mitchell.

[5] Dr. White's report does not indicate where or when the MRI was administered.

[6] The record does not contain any reports from Dr. Monsey.

herniation and some degenerative disc disease with "no evidence of neural compression". (T. 115).   Plaintiff advised Dr. Grzyb that she experienced hip pain with prolonged sitting and standing, lying down, walking, driving, lifting, pulling, pushing or bending. (T. 115).  Upon examination, Dr. Grzyb noted plaintiff was able to heel/toe walk, raise on her heels and toes and get down and up from a squat. (T. 115).  Dr. Grzyb noted increased pain with extension and forward flexion to mid-shin. (T. 115).  Dr. Grzyb noted no spasm or true area of tenderness, straight leg raising was negative in the sitting and supine positions, no clonus and reflexes were symmetric. (T. 115).  Dr. Grzyb noted full and painless range of motion in the cervical spine with no deficits of the upper extremities. (T. 116).  Dr. Grzyb concluded that plaintiff's physical examination did not reveal any lumbar radiculopathy and ordered an MRI from Massena Hospital to rule out the need for further orthopaedic intervention. (T. 116).  Dr. Grzyb advised plaintiff that she could return to work after he reviewed the MRI. (T. 116).

On March 9, 2000, Dr. Grzyb forwarded a letter to plaintiff and advised that the results of the MRI taken on March 4, 2000 were unchanged from prior studies as the radiologist found "no evidence of any pressure on the nerves of the lumbar spine". (T. 117).  Dr. Grzyb stated that it "does not appear that you would require any type of surgical treatment" and advised plaintiff to refrain from heavy lifting and to continue her medications as prescribed by her family physician. (T. 117).  On March 17, 2000, Dr. Grzyb opined that plaintiff should be able to return to work and suggested treatment with a physical therapist. (T. 118).

On October 5, 2001, plaintiff returned for treatment with Dr. Sullivan for back pain.  (T.

98).  Plaintiff advised Dr. Sullivan that she had been in the "ER and discharged on Celebrex".[7] (T.

98).  Dr. Sullivan diagnosed plaintiff with "back and left axillary pain" and advised her to

continue with Celebrex for one month. (T. 98).  On November 2, 2001, Dr. Sullivan noted "her

back pain is better" and diagnosed plaintiff with possible MS. (T. 98).  Dr. Sullivan requested a

"repeat MRI of the brain" and told plaintiff to continue with Celebrex.[8] (T. 98).  On January 16,

2001, Dr. Sullivan noted that the MRI of her brain was "negative". (T. 99).

On February 12, 2002, plaintiff treated with Dr. Sullivan for "worsening back pain".  (T.

99).  Dr. Sullivan noted that plaintiff had pre-existing disc disease.  (T. 99).  Plaintiff claimed that

she suffered "a trauma 4 weeks ago". (T. 99).  Dr. Sullivan diagnosed plaintiff with back pain and

ordered an MRI of her lumbar spine. (T. 99).

On February 16, 2002, an MRI of plaintiff's lumbar spine was performed at Massena

Memorial Hospital Medical Imaging. (T. 111).  The radiologist noted "degenerative disc disease

at L4/5; small central and right paracentral disc herniation at L5/S1; facet osteoarthritis most

marked on the left at L4/5 and 5/1". (T. 111).  On February 21, 2002, Dr. Sullivan noted that

plaintiff's MRI revealed osteoarthritis to the L4-L5 and disc protrusion at L5-S1. (T. 99).  Dr.

Sullivan diagnosed plaintiff with back pain and, at her request, referred her "to Rochester". (T.

99).

On March 8, 2002, plaintiff was treated by Dr. George Mina.[9]  Plaintiff complained of

back pain and pain in her left buttock. (T. 127).  Upon examination, Dr. Mina noted that

---

[7] The record does not contain reports of any emergency room visits for this time period.  Celebrex is a nonsteroidal anti-inflammatory drug used for symptomatic treatment of osteoarthritis and rheumatoid arthritis. *Dorland's* at 317.

[8] The record does not contain any report of any MRI study of plaintiff's brain prior to November 2001.

[9] The record does not indicate whether or not Dr. Mina was specialized in any area of medicine.

plaintiff's spine was tender, range of motion "0-60", and straight leg raising painful at 60 degrees on the left. (T. 127). Dr. Mina diagnosed plaintiff with low back syndrome with degenerative disc disease and osteoarthritis of the lumbar spine. (T. 127). Dr. Mina prescribed exercises, Motrin and Ultracet.[10]  (T. 127).

Dr. Mina completed an assessment for the New York State Office of Temporary and Disability Assistance on April 15, 2002. (T. 128). The assessment was based upon his examination of March 8, 2002. (T. 128). Dr. Mina diagnosed plaintiff with "chr. l.b.s." and listed her symptoms as "back pain". (T. 128). Dr. Mina indicated that his clinical findings were based upon the MRI of the lumbar spine which revealed "d.d.d.". (T. 129). Dr. Mina opined that plaintiff was limited to occasionally lifting and carrying 20 pounds; limited to standing and/or walking and sitting for 6 hours per day; and limited in her ability to push and/or pull (but did not specify the limitation). (T. 131).

On March 25, 2002, plaintiff was examined by Dr. Wiebe, a neurologist, at the request of Dr. Sullivan. (T. 133). Plaintiff complained of low back and lower extremity radicular pain and indicated that the pain was so severe that she was forced to leave work. (T. 133).   Upon examination, Dr. Wiebe found tenderness at the lumbosacral junction and sciatica notch but his assessment of power was inhibited by plaintiff "giving out". (T. 134). Dr. Wiebe noted that plaintiff was able to raise from a squat and stand for a prolonged period on her toes. (T. 134). Dr. Wiebe diagnosed plaintiff with lumbosacral spondylosis with discogenic pain.  (T. 135). Dr. Wiebe noted that plaintiff would not benefit from surgery and that therapy should include non-surgical measures. (T. 135). Dr. Wiebe advised plaintiff to stop smoking, exercise and stretch.

---

[10] Ultracet is an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures.  *Dorland's* at 1977, 2027.

(T. 135).  Dr. Wiebe prescribed a lumbar corset to be worn when plaintiff was active. (T. 135).

From March 2002 until October 2002, plaintiff complained to Dr. Sullivan of "ongoing back and right hip pain". (T. 100). Dr. Sullivan examined plaintiff's extremities and noted "no edema". (T. 100).  Dr. Sullivan ordered x-rays of plaintiff's right hip which revealed "some djd to the right hip". (T. 112).  Dr. Sullivan diagnosed plaintiff with back pain, prescribed Vicodin and advised her to stay out of work until her April 17th appointment "in Burl.".[11] (T. 100).

On April 17, 2002, plaintiff had a follow up visit with Dr. Grzyb at the request of Dr. Sullivan. (T. 119).  Dr. Grzyb noted that his last examination of plaintiff was February 2000 and that plaintiff currently complained of low back discomfort. (T. 119).  Upon examination, Dr. Grzyb found "no evidence of neurological impairment", reflexes present, no clonus, and discomfort on extension and flexion. (T. 119).  Dr. Grzyb opined that plaintiff would not benefit from surgery and noted that plaintiff recently saw Dr. Krawchenkond (who also advised against surgery).[12]  (T. 119).  Dr. Grzyb suggested conservative care with medications, a TENS unit and physical therapy.  (T. 119).  Plaintiff requested a "disability determination" from Dr. Grzyb who refused and advised that "I do not do those". (T. 119).

In September 2002, plaintiff underwent a bone scan which Dr. Sullivan noted to be "negative". (T. 102).  In October 2002, Dr. Sullivan indicated that plaintiff had an MRI of her cervical spine that "reveals spinal stenosis at C6-7". (T. 102).

On November 8, 2002, plaintiff treated with Dr. Grzyb, at the request of Dr. Sullivan, for complaints of numbness in her right upper extremity.  (T. 120).  Upon examination, Dr. Grzyb

---

[11] Vicodin is a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects. *Dorland's* at 890, 2084.

[12] The record does not contain any notes or reports from Dr. Krawchenkond.

noted that he could not reproduce her symptoms.  Dr. Grzyb reviewed MRI films of plaintiff's

cervical spine and noted that the films were taken in an open unit and were not of "diagnostic

quality". (T. 120).  Dr. Grzyb suggested that plaintiff repeat the films in a closed unit. (T. 121).

Dr. Grzyb re-examined plaintiff on November 21, 2002 for continuing complaints of neck pain.

(T. 122).  Dr. Grzyb noted that the second MRI revealed a right-sided disc herniation at C6/7 that

"could involve the nerve root". (T. 122).  Upon examination, Dr. Grzyb noted that he could not

"get replication of  the upper extremity symptoms with provocation". (T. 122).  Dr. Grzyb also

stated "I cannot find obvious motor deficits."  (T. 122).  Dr. Grzyb diagnosed plaintiff with

degenerative disc disease with herniation at C6/7. (T. 122).  Dr. Grzyb suggest to plaintiff that she

consider injection therapy with Dr. Cody. (T. 122).  Dr. Grzyb further advised plaintiff that if she

was still symptomatic after receiving nerve blocks, that she should consult a spinal surgeon.[13] (T.

122).  Plaintiff telephoned Dr. Grzyb on December 3, 2002 to advise that she received a nerve

root injection on November 27, 2002 but that it did not provide any relief. (T. 123).  Plaintiff

complained to Dr. Grzyb of continued upper extremity numbness, extending to her right cheek

and ear.  (T. 123).  Dr. Grzyb noted that he would contact Dr. Sullivan and suggest that he obtain

an MRI of plaintiff's brain to rule out pathology given her complaints of facial numbness. (T.

123).

On January 21, 2003, plaintiff was treated by Dr. Michael Horgan, a neurologist at the

Spine Institute of New England.[14]  (T. 173).  Plaintiff complained of a history of low back pain,

pain in the right neck and arm extending down into her hand. (T. 173).  Upon examination, Dr.

---

[13] The record does not contain any reports from Dr. Cody or of injection therapy.

[14] Dr. Horgan's report indicated plaintiff was previously treated at the Spine Institute but the record does
not contain any prior records.

Horgan found plaintiff fairly depressed, flexion and extension of her neck was done without difficulty, strength in the upper and lower extremities 5/5 and reflexes intact.  (T. 174).  An examination of her lower extremities was "unremarkable". (T. 174).  Dr. Horgan concluded that plaintiff presented with C7 radiculopathy but due to "the lack of hard neurological findings", conservative treatment was recommended. (T. 174).  Dr. Horgan did not recommend surgery and prescribed a course of physical therapy. (T. 174).

On January 29, 2003, plaintiff underwent an initial evaluation by Eileen Fregoe, PT.  (T. 194).  The therapist noted that plaintiff complained of constant neck and right arm pain exacerbated by doing housework. (T. 194).  The therapist suggested treatment two to three times a week for four weeks including traction and massage.  (T. 194).  Plaintiff was discharged from therapy on February 28, 2003 after receiving four treatments. (T. 198).  The reason for her discharge was "lack of contact, despite attempts to notify". (T. 198).

On March 12, 2003, plaintiff had a follow up visit with Dr. Horgan. (T. 202).  Plaintiff complained of right upper extremity pain radiating to her fingers and further stated "things have been worse since she fell on ice 2-3 days ago". (T. 202).  Dr. Horgan was reluctant to offer surgery but "in the circumstances given the degree of her pain out of proportion to her other pains and coinciding with the C7 nerve root", Dr. Horgan concluded that it would be reasonable to offer surgery. (T. 202).  Dr. Horgan noted he would review plaintiff's films and tentatively set a surgical date. (T. 202).

On April 1, 2003, plaintiff returned to Dr. Horgan with her films. (T. 204).  Dr. Horgan discussed surgery with plaintiff and plaintiff advised that she wished to proceed as conservative treatment had failed. (T. 204).  Surgery was performed by Dr. Horgan on April 21, 2003

consisting of a C6-7 discectomy and fusion. (T. 205).  Plaintiff had two post-operative visits with

Dr. Horgan in May 2003. (T. 207-208).  On May 6, 2003, Dr. Horgan stated that plaintiff "was a

difficult person to read" and that she was depressed and unanimated. (T. 207).  Dr. Horgan noted

that plaintiff complained of neck pain radiating to both arms and that plaintiff seemed "non-

plused" and "even occasionally smiling". (T. 207). Dr. Horgan noted that her physical

examination was unremarkable. (T. 207).  On May 27, 2003, Dr. Horgan noted that plaintiff's

examination was "difficult" due to her "poor effort". (T. 208).

On September 23, 2003, plaintiff returned to Dr. Horgan complaining of low back and bi-

lateral extremity pain. (T. 209).  Upon examination, Dr. Horgan noted excellent strength in upper

and lower extremities although plaintiff gave "a poor effort". (T. 209).  Dr. Horgan noted that he

did "not have a clear explanation for her pain pattern" and "wonder[ed] if there is an underlying

depression". (T. 209).  Dr. Horgan discussed a referral to the Pain Clinic and noted that "surgery

was not going to be helpful".[15] (T. 209).  In an addendum, Dr. Horgan indicated plaintiff was

scheduled for an EMG in Albany.[16] (T. 210).

On November 3, 2003, plaintiff was treated by Dr. Richard Smoot at the Prime Care

Clinic in Potsdam.[17] (T. 215).  Dr. Smoot noted plaintiff had a 10 year problem with chronic neck

pain. (T. 215).  Dr. Smoot noted that an EMG and bone scan were both negative.[18] (T. 215).  Dr.

Smoot performed a physical examination of plaintiff and opined that plaintiff's neck pain

---

[15] The record does not contain any reports from the "pain clinic".

[16] An EMG (an electromyogram) is a record of electromyography which is a technique for recording the
extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.
*Dorland's* at 609.

[17] The record does not indicate whether or not Dr. Smoot is specialized in any area of medicine.

[18] The record does not contain any EMG or bone scan results or reports.

required pain relief and prescribed Oxycodone, Methocarbamol and Neurontin.[19] (T. 216).   Dr. Smoot stated "will have to teach her some back exercises, later". (T. 216).

On February 17, 2004, plaintiff underwent an MRI of her cervical spine at Canton-Potsdam Hospital Imaging Services Department. (T. 217).  The radiologist concluded "no evidence of granulation tissue impinging on the thecal sac or nerve root sleeves.  There is some focal disc bulging at C5-6 and mild broad-based bulging of the disc at C4-5". (T. 217).

**B.**     **Plaintiff's medical treatment for depression**

On November 2, 2001, Dr. Sullivan noted plaintiff  "is suffering from some depression" and prescribed Prozac.[20]  (T. 98).   In May 2002, Dr. Sullivan noted that plaintiff was concerned about her depression and claimed that Prozac was "no longer effective". (T. 100).  Dr. Sullivan diagnosed plaintiff with depression and prescribed Celexa.[21]  (T. 100).  In July 2002, Dr. Sullivan noted that the Celexa was not "helping" and prescribed Wellbutrin.[22] (T. 101).

On September 9, 2002, plaintiff was evaluated at St. Lawrence Psychiatric Center. (T. 167).  Plaintiff was initially screened and evaluated by Mary Ann VanBuskirk.[23] (T. 167).  Ms. VanBuskirk indicated that plaintiff complained of depression, ongoing tearfulness, irritability and

---

[19] Oxycodone is a derivative of Morphine (the principal and most active opioid alkaloid of opium (q.v.) having powerful analgesic action and some central stimulant action used as an analgesic for relief of severe pain.  *Id.* at 1377.  Methocarbamol is a skeletal muscle relaxant used in the treatment of painful musculoskeletal conditions. *Id.* at 1165.  Neurontin is an anticonvulsant used as adjunctive therapy in the treatment of partial seizures.  *Id.* at 764, 1287

[20] Prozac is used in the treatment of depression and obsessive-compulsive disorder.  *Dorland's* at 730, 1562.

[21] Celexa is an anti-depressant.  *Dorland's* at 317, 372.

[22] Wellbutrin is used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal. *Id.* at 265, 2107.

[23] The record does not specify Ms. VanBuskirk's position or credentials.

outbursts. (T. 167).  Plaintiff advised Ms. VanBuskirk that she had recently learned that her son

(now age 9) was molested at age 4. (T. 167).  Plaintiff stated that her 15 year old daughter was

"on probation" and that her 12 year old son had ADHD. (T. 167). Plaintiff advised that she had

stopped taking Wellbutrin. (T. 167).  Ms. VanBuskirk noted plaintiff was causally dressed and

groomed, eye contact was appropriate, and she was tearful. (T. 167).  Ms. VanBuskirk found

plaintiff's affect to be depressed and indicated plaintiff had suicidal ideals two months ago.  (T.

167). Ms. VanBuskirk also noted plaintiff's long term memory was intact and her judgment was

adequate. (T. 168).  Plaintiff was accepted for further screening and scheduled for an evaluation

with Dr. Sanghi. (T. 168).

On September 17, 2002, Dr. Harishanka Sanghi performed a psychiatric evaluation of

plaintiff.  Dr. Sanghi noted plaintiff was "self-referred for depression, anxiety and insomnia". (T.

170).  Plaintiff advised Dr. Sanghi that she never felt suicidal in the past and that she received

outpatient treatment at a clinic in Potsdam in 2000.[24] (T. 170).  Plaintiff claimed that during

psychotherapy, she became aware of her son's abuse.  (T. 170).  Plaintiff stated she was first

married at age 13 to an alcoholic. (T. 170). Plaintiff indicated that she lived with her boyfriend

and that her two older children resided with her sister. (T. 170).   Dr. Sanghi noted plaintiff had

many stressors including children, her ex-husband and impending child abuse charges with regard

to her son. (T. 171). Upon examination, Dr. Sanghi noted plaintiff was overweight, appropriately

dressed and cooperative. (T. 171).  Dr. Sanghi found plaintiff to be fully oriented with good

memory and concentration. (T. 171).  Dr. Sanghi noted that plaintiff's affect was blunted with

mild depression and anxiety.  (T. 171).  Dr. Sanghi diagnosed plaintiff with adjustment disorder

---

[24] The record does not contain any reports from any "outpatient treatment clinic".

with depressed mood and personality disorder. (T. 171-172).  Dr. Sanghi prescribed Effexor and Trazodone and assigned plaintiff to a therapist.[25] (T. 172).

On October 22, 2003, plaintiff appeared at the emergency room of Massena Memorial Hospital complaining of heart palpitations and dizziness. (T. 211).  Plaintiff denied experiencing any suicidal thoughts. (T. 212).   Plaintiff was diagnosed with depression, anxiety, sleepiness and "side effects of Effexor". (T. 211).  Plaintiff was advised to follow with Dr. Sanghi and to lower her dose of Effexor. (T. 211).

On November 3, 2003, during plaintiff's initial examination with Dr. Smoot, plaintiff relayed a history of depression for which she claimed was treating with a psychiatrist and taking Effexor. (T. 215).  Dr. Smoot advised plaintiff to continue taking Effexor for anxiety and depression and to "continue to follow in Mental Health in Massena". (T. 216).

**B.      Consultative Examinations**

Richard W. Williams, Ph.D.

On May 21, 2002, plaintiff was examined by Richard W. Williams, Ph.D., at the request of the agency. (T. 136).  Plaintiff complained of back pain, hip pain and shooting pain down both legs. (T. 136).  Plaintiff also stated "she has been depressed most of her life". (T. 136).  Plaintiff advised Dr. Williams that she was raped at age 16 and dropped out of high school after the 11th grade to get married. (T. 136).  Plaintiff eventually went back to school and graduated.  (T. 137).  Plaintiff claimed she was sexually harassed by her former father-in-law for 13 years and stated that she left her husband for another man who later molested her 5 year old boy. (T. 136).  Plaintiff claimed she was recently interviewed by the police for an incident involving her 14 year

---

[25] Effexor is used as an antidepressant and antianxiety agent. *Dorland's* at 602, 2074. Trazadone is an antidepressant used to treat major depressive episodes with or without prominent anxiety. *Id.* at 1983

old daughter and a 23 year old man who allegedly "took advantage of her". (T. 136).  Plaintiff claimed she was depressed every day and felt guilty that her children suffered abuse. (T. 136).  Plaintiff complained to Dr. Williams of nightmares, no motivation, an inability to sleep and memory problems. (T. 136).  Plaintiff advised that she had received counseling a couple of years ago and stated that she was taking Fluoxitine as prescribed by her family doctor.[26] (T. 136).  Plaintiff admitted to having suicidal ideals six weeks ago after a confrontation with her ex-husband but denied any delusions, hallucinations or thought disorders. (T. 137).  Plaintiff stated she was able to handle household chores, clean, cook, do dishes, shop and drive her standard transmission vehicle. (T. 137).

During the interview, Dr. Williams noted that plaintiff was cooperative, alert and oriented. (T. 137).  Dr. Williams found that plaintiff's mental control, attention and concentration were good and that her judgment was fair but impulsive. (T. 138).  Dr. Williams diagnosed plaintiff with major depressive disorder and self-reported back pain and noted that plaintiff was not amenable to talk therapy. (T. 138).

Dr. Williams opined that plaintiff's depression was "more severe since 1997 when her son was abused". (T. 138).  Dr. Williams concluded that plaintiff needed counseling and with counseling, her prognosis was fair to good.  (T. 138).  Dr. Williams stated that plaintiff had some interest in working and that her inability to work was due to her back pain and numbness. (T. 138).

David G. Welch, M.D.

---

[26] Fluoxitine is the generic form of Prozac.  *Dorland's* at 730.  The record does not contain reports or notations from any "counselor".  The consultative examination was performed prior to plaintiff seeking treatment at St. Lawrence Psychiatric Center.

On May 31, 2002, plaintiff was evaluated by Dr. David Welch at Adirondack Rehabilitation Medicine, at the request of the agency. (T. 140).  Upon examination, Dr. Welch noted plaintiff's stance and gait were fairly normal, her heel walk was normal, plaintiff could forward flex to the shin, straight leg raising was positive on the left at 80 degrees and right at 70 degrees, range of motion was met with significant discomfort, lower extremity motions were normal and reflexes were normal. (T. 140).  Dr. Welch noted that plaintiff was wearing a TENS unit that she received two days earlier. (T. 140).  Dr. Welch diagnosed plaintiff with low back pain and suggested that she continue with anti-inflammatories and the TENS unit. (T. 140).  Dr. Welch opined that plaintiff was restricted in her ability to lift, bend and twist. (T. 140).  Dr. Welch noted that plaintiff could lift no more than 10 pounds and could reach but not twist with her upper extremities.  (T. 140).  Dr. Welch also noted that "getting a psychological assessment may delve deeper into this [sic] as to whether or not there is any significant limitations based on her depressive problems". (T. 140).

**C.      Residual functional capacity assessments**

On June 4, 2002, a Mental RFC Assessment was prepared by Ann Herrick, Ph.D., at the request of the agency. Dr. Herrick noted that plaintiff was not significantly limited in her ability to understand or her memory. (T. 141).  Dr. Herrick stated that plaintiff was moderately limited in her ability to carry out instructions, maintain concentration and maintain a regular schedule. (T. 141).  Dr. Herrick opined that plaintiff's social interaction and adaptation skills were not significantly limited. (T. 142).  Dr. Herrick opined that plaintiff suffered from depression but that the level of limitation is not marked.  (T. 142).  Dr. Herrick concluded that plaintiff retained sufficient RFC such that she is "capable of adequately understand and remembering; of attending,

concentrating, and persisting; of interacting with others such that she is capable of work-related tasks". (T. 143).

Dr. Herrick also completed a Psychiatric Review Technique which included a Rating of Functional Limitations consistent with "B" Criteria of the Listings. (T. 145-158).  Dr. Herrick found that plaintiff had moderate restriction of activities of daily living; slight difficulties in maintaining social function and that she often demonstrated deficiencies in maintaining concentration, persistence or pace. (T. 155).  Dr. Herrick found there was "insufficient evidence" to comment on the number of episodes of deterioration. (T. 155).

The record also contains a Physical RFC assessment completed by W. Denny, a disability analyst, on July 8, 2002. (T. 159).  The analyst found that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk about 6 hours in an 8 hour workday; and was unlimited in her ability to push/pull. (T. 160).  The analyst noted that "no exertional limits are specified.  Credibility can't be assessed".  (T. 164).

## IV.  ADMINISTRATIVE LAW JUDGE'S DECISION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the

Commissioner must find him disabled if (5) there is not another type of work the
claimant can do." The claimant bears the burden of proof on the first four steps, while
the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311

F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal

citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful

activity since the alleged onset of her disability.  (T. 15).  At step two, the ALJ concluded that

plaintiff has significant limitations on her ability to perform basic work activities due to

degenerative disc disease and osteoarthritis of the lumbosacral spine, degenerative disc disease of

the cervical spine and major depressive disorder which qualified as  "severe impairments" within

the meaning of the Social Security Regulations (the "Regulations").  (T. 16).  At the third step of

the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of

any impairment listed in Appendix 1 of the Regulations.  (T. 16).  At the fourth step, the ALJ

found that plaintiff had the residual functional capacity ("RFC") to perform work at the "light"

exertional level.  (T. 17).  The ALJ then found that plaintiff's conditions did not prevent her from

returning to her past relevant work as a telemarketer.  (T. 18).  Therefore, the ALJ concluded that

plaintiff was not under a disability as defined by the Act.  (T.  18).

## V.    DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the

factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw*

*v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence has been interpreted to mean

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Plaintiff argues that the ALJ: (1) failed to review and properly assign weight to the medical evidence; (2) failed to properly consider the extent of plaintiff's mental impairments; (3) failed to properly assess plaintiff's RFC; (4) improperly discounted plaintiff's subjective complaints of pain; and (5) erroneously concluded that plaintiff could perform her past relevant work.  (Dkt. No. 11).

**A.      Evaluation of Medical Evidence**

Plaintiff asserts that the ALJ failed to review and weigh the bulk of the medical evidence and further, that the ALJ failed to properly consider the disability determination of another governmental agency. (Dkt. No. 11, p. 14).  Defendant argues that the ALJ expressly reviewed and assigned the proper weight to all evidence in the record. (Dkt. No. 13, p. 9).

The ALJ is required to set forth the essential considerations upon which his decision is based, with sufficient particularity to enable the reviewing court to decide whether the disability determination was supported by substantial evidence.  *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983).  Despite the ALJ's failure to summarize every medical record, the Court is able to look to other portions of the ALJ's decision and to decide whether the determination is supported by substantial evidence.  *See Esteves v. Barnhart*, 492 F.Supp.2d 275, 281 (W.D.N.Y. 2007) (citing *Pena v. Chater*, 968 F.Supp. 930, 938 (S.D.N.Y. 1997)).  Moreover, although required to develop the record fully and fairly, an ALJ's failure to cite specific evidence does not indicate that it was not considered.  *Barringer v. Comm'r of Social Sec.*, 358 F.Supp.2d 67, 78 -79 (N.D.N.Y. 2005).

Plaintiff's brief provides a summary of various records which plaintiff alleges the ALJ failed to weigh, review or acknowledge. (Dkt. No. 11, pp. 12-13).   However, plaintiff does not provide specific objections regarding why certain records or opinions are entitled to controlling weight.  Plaintiff seemingly argues that the ALJ failed to apply the "treating physician rule" to various opinions or conclusions.

### 1.     Treating Physician Rule

The relevant Regulation provides that the Secretary will give controlling weight to a "treating source's opinion on the issue(s) of the nature and severity of your impairment(s)" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2).  Such opinions, if supported by medically acceptable clinical and diagnostic techniques and if consistent with other substantial evidence in the record, would have been entitled to controlling weight.  *See id*.  A treating source is defined as a plaintiff's own physician or psychologist who has provided plaintiff with medical treatment or evaluation and who has had an ongoing treatment relationship with the plaintiff.  *Fernandez v. Apfel*, 1998 WL 812591, at *3 (E.D.N.Y. 1998) (citing 20 C.F.R.§ 404.1502).  Doctors who see a patient only once do not have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999); *see also Schisler v. Bowen,* 851 F.2d 43, 45 (2d Cir. 1988) (finding that a physician had only seen the plaintiff on two occasions and therefore the nature of his relationship with the plaintiff did not rise to the level of a treating physician).

Although the ALJ should "comprehensively" set forth the reasons for the weight assigned

to a treating physician's opinion, the failure to do so does not require remand if it can be ascertained from the entire record and the ALJ's opinion that the ALJ "applied the substance" of the treating physician rule. *Botta v. Barnhart*, 475 F.Supp.2d 174, 188 (E.D.N.Y. 2007) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004) (internal citations omitted)). An ALJ is under no obligation to chant the mantra "treating physician rule" in addition to invoking it by code citation and applying it consistent with the evidence in the record. *See Shipman v. Astrue*, 2008 WL 216615, at *7 (S.D.N.Y. 2008)

In this matter, the ALJ stated that "the undersigned must also consider any medical opinions in the record" and specifically referenced 20 CFR § 416.927, thereby expressly invoking the treating physician rule and putting it on the record as having been considered. (T. 17). The treating physician rule does not apply to Drs. Williams and Welch as they are consulting doctors. *See Goldthrite v. Astrue*, 2008 WL 445770, at *10 (W.D.N.Y. 2008). Drs. Smoot, White, Wiebe and Sanghi cannot be considered treating sources as the record indicates that each of these physicians treated plaintiff on only one occasion. (T. 113, 133-134, 171, 215); 20 C.F.R.§ 404.1502.

The Court notes that Drs. Sullivan, Grzyb, Horgan and Mina are considered treating sources based upon their relationship with plaintiff. Dr. Mina is the only treating physician to offer an opinion regarding plaintiff's particular functional limitations. (T. 128). The ALJ clearly assigned controlling weight to Dr. Mina's opinion as he incorporated Dr. Mina's conclusions into his assessment of plaintiff's RFC. (T. 17). The record does not contain any functional assessment by any other treating source. Further, there is no evidence in the record that conflicts with Dr. Mina's opinions. The remaining treating sources failed to provide opinions on plaintiff's

abilities to do work-related activities or plaintiff's level of disability.  Dr. Sullivan's records contain a recitation of plaintiff's subjective complaints.  Dr. Grzyb noted that he could not "replicate" plaintiff's symptoms and Dr. Horgan could offer no "explanation" for plaintiff's pain patterns.  Therefore, the ALJ did not err in failing to discuss what weight should be given to Drs. Sullivan, Grzyb and Horgan's findings as none of those findings described plaintiff's functional limitations.  *See Hopper v. Comm'r of Social Sec.*, 2008 WL 724228, at *9 (N.D.N.Y. 2008) (holding that the ALJ did not err in failing to discuss what weight should be given to a physician's findings as none of those findings described the plaintiff's limitations).  Thus, a conclusion that the ALJ did not consider or properly weigh all of the medical opinions is unwarranted.

### 2.      Determination of another governmental agency

Plaintiff further alleges that the ALJ failed to consider the disability determination of the St. Lawrence County Department of Social Services. (T. 103); (Dkt. No. 11, p. 10).  While the determination of another governmental agency that a social security disability benefits claimant is disabled is not binding on the Secretary, it is entitled to some weight and should be considered.  *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975); *see also Stieberger v. Sullivan*, 738 F.Supp. 716, 744 -745 (S.D.N.Y. 1990) (recommending that adjudicators acknowledge that disability determinations of another government agency that a claimant is disabled are material evidence which should be considered by them and reflected in the disability determination).

In this matter, contrary to plaintiff's argument, the ALJ acknowledged and specifically assigned "little weight" to the determination. (T. 17).   In the decision, the ALJ concluded:

> The record contains documents indicating that the claimant is disabled for purposes of state public assistance benefits.  These disability decisions have been given little weight in determining the claimant's residual functional capacity because they are not supported by objective medical findings. (T. 17).

22

Therefore, plaintiff's objection is without merit.

**B.    Extent of Mental Impairments**

Plaintiff argues that the ALJ failed to follow the required steps in considering the extent of her mental impairments. (Dkt. No. 11, p. 14).  The Commissioner asserts that the ALJ specifically found that plaintiff's depression did not meet or equal the Listing set forth at 20 C.F.R. Part 404, Subpt. 1. (Dkt. No. 13, p. 12).

An ALJ must use a "special technique" to determine the severity of a claimant's mental impairment. 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  First, the ALJ must evaluate the claimant's symptoms, as well as other signs and laboratory findings, and determine whether the claimant has a "medically determinable impairment." 20 C.F.R.  §§ 404.1520a(b)(1), 416.920a(b)(1).  If a medically determinable impairment exists, the ALJ must "rate the degree of functional limitation resulting from the impairment[ ]." 20 C.F.R.  §§ 404.1520a(b)(2), 416.920a(b)(2).  This process requires the ALJ to examine all relevant clinical and laboratory findings, as well as the effects of the symptoms on the claimant, the impact of medication and its side effects, and other evidence relevant to the impairment and its treatment. 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1).  The ALJ must rate the degree of the claimant's functional limitation in four specific areas, referred to as "Paragraph B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme," and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).  If the first three areas are rated as "none" or "mild," and the fourth as "none," the ALJ will conclude that the mental impairment is not

severe "unless the evidence otherwise indicates that there is more than a minimal limitation in

[the claimant's] ability to do basic work activities."  20 C.F.R. §§ 404.1520a(d)(1),

416.920a(d)(1).

In the decision, the ALJ determined that plaintiff suffered from "major depressive

disorder". (T. 16).  Accordingly, the ALJ continued with an analysis of the "Paragraph B"

criteria. (T. 16).  The ALJ found:

> Consistent with the opinion of a State Agency medical consultant, the claimant's
> major depressive disorder imposes moderate limitations on her activities of daily
> living, mild limitations on her social functioning and moderate limitations on her
> concentration, persistence, or pace.  There is no evidence that the claimant has
> experienced any episodes of decompensation due to major depressive disorder. (T.
> 16).

The ALJ specifically referenced the Rating of Functional Limitations completed by Dr. Herrick.

(T. 155).  In that assessment, Dr. Herrick performed an analysis of the degree of functional

limitations consistent with "B" Criteria of the Listings. (T. 155).  Based upon Dr. Herrick's

opinions, at step three, the ALJ concluded:

> ". . . the record does not contain findings that meet or medically equal any listing in
> Appendix 1.  Accordingly, the sequential evaluation must continue. (T. 16).

The Court finds that the ALJ properly analyzed plaintiff's mental impairments at this step

and concluded that plaintiff's depressive disorder did not meet the criteria of a list impairment.

As required, the ALJ then proceeded to assess plaintiff's RFC.

## C.     Residual Functional Capacity

Plaintiff argues that the ALJ's RFC assessment is flawed as it does not contain a "function

by function assessment" of plaintiff's ability to do work-related activities. (Dkt No. 11, p. 18).

Further, plaintiff argues that the ALJ failed to consider plaintiff's depression in the RFC analysis.

*Id.*

> Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a).

### 1.   Function-by-Function Analysis

A residual functional capacity assessment "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis.  *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). Courts have held that although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce a detailed statement in writing.  *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *13 -14  (S.D.N.Y. 2007) (internal citations omitted).  An ALJ must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities.  *Casino-Ortiz*, 2007 WL 2745704, at *13-14 (concluding that although the decision did not specify function-by-function analysis, the ALJ properly stated that his decision concurred with the consultative examinations and the state

agency review report, all of which made specific findings as to the plaintiff's ability to perform work related functions).

In this case, the ALJ found:

Based on the aforementioned opinions of Dr. Mina and the State Agency reviewers, the undersigned concludes that the claimant has the residual functional capacity to perform work at the "light" exertional level. (T. 17).

Dr. Mina provided his opinion regarding plaintiff's ability to do work related physical activities and specifically found that plaintiff could lift up to 20 pounds, stand and walk up to 6 hours a day, and sit for up to 6 hours a day. (T. 130-131).  Dr. Mina's conclusions are consistent with the definition of "light work".[27]   The ALJ's RFC determination is based upon Dr. Mina's assessment, which sets forth the specific findings claimed to be missing by plaintiff.  *See Barringer v. Comm'r of Social Sec.*, 358 F.Supp.2d 67, 83 (N.D.N.Y. 2005).   Therefore, the ALJ's RFC determination was set forth with sufficient specificity.

**2.    Assessment of Mental Impairments**

Plaintiff contends that the ALJ failed to incorporate any limitations from plaintiff's mental impairments into his analysis of plaintiff's RFC. (Dkt. No. 11, p. 18).  Defendant asserts that the ALJ determined plaintiff could perform the basic demands of work and that the base of light jobs was not diminished. (Dkt. No. 13, p. 15).  The ALJ's determination of plaintiff's RFC incorporated the opinion of Dr. Herrick, the state agency analyst. (T. 17).  Dr. Herrick specifically found that:

---

[27] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b).

. . . claimant retains sufficient RFC such that she is capable of adequately understand [sic] and remembering; of attending, concentrating, and persisting; of interacting with others such that she is capable of work-related tasks. (T. 143).

The ALJ properly relied upon and afforded controlling weight to the functional assessment of Dr. Herrick as the record contains no functional analysis to contradict Dr. Herrick's conclusions.  Plaintiff's treatment for depression was limited to one initial evaluation with a therapist; one visit with a psychiatrist; and one visit to an emergency room. (T. 167, 170, 211). Although Dr. Sullivan prescribed medications for depression, Dr. Sullivan's notations consist of plaintiff's subjective complaints only and are devoid of any objective evidence or testing. (T. 98-101).  Moreover, the record does not include any functional evaluations of plaintiff's mental impairments by any examining psychologist or psychiatrist.   Plaintiff advised Dr. Williams that her last job "did not last because of her back" and Dr. Williams noted "[s]he seems to have some interest in working and I suspect that she would be able to if her back pain and numbness were under control". (T. 138).

There is substantial evidence in the record to suggest that plaintiff did not have a disabling mental condition.  *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).  Thus, the Court finds that the ALJ properly assessed plaintiff's mental impairments and determined that her depressive disorder did not limit her ability to perform work-related activities.  The ALJ's conclusion that plaintiff was capable of light work is supported by substantial evidence.

**D.     Credibility**

Plaintiff argues that the ALJ erred in determining that plaintiff's subjective complaints of pain were "less than fully credible". (Dkt. No. 11, p. 19).

When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence[.]" *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *11, n. 21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)) . If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with her pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her neck and back pain are consistent with the objective medical and other evidence. *See* Social Security Ruling 96-7p, 1996 WL 374186, at *2.

The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus*, 615 F.2d at 27; *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility). When rejecting subjective complaints of pain, an ALJ must do so "explicitly

and with sufficient specificity to enable the Court to decide whether there are legitimate reasons

for the ALJ's disbelief[.]" *Brandon v. Bowen*, 666 F. Supp 604, 608 (S.D.N.Y. 1987).  If the

Commissioner's findings are supported by substantial evidence, "the court must uphold the ALJ's

decision to discount a claimant's subjective complaints of pain."  *Aponte v. Secretary, Dept. of

Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).   A reviewing court's role is merely

to determine whether substantial evidence supports the ALJ's decision to discount a claimant's

subjective complaints. *Aponte*, 728 F.2d at 591  (quotations and other citations omitted).

     In this matter, plaintiff testified during the hearing that she experienced chronic pain in her

back, right hip, hands, right knee and neck. (T. 17).  Plaintiff further stated that she was

depressed, experienced suicidal thoughts and had constant headaches. (T. 17).  The ALJ found

that plaintiff's subjective complaints of pain were "less than fully credible" and stated:

> There is evidence that the claimant is able to care for her son, prepare simple meals,
> drive a car, tend to flower beds, and go shopping.  Aside from an emergency room
> visit in October 2003, it appears that the claimant has received no treatment in recent
> months for depression.  The claimant testified that her medications cause adverse
> side effects, but this claim is not supported by other evidence of record.  It is also
> noteworthy that a spine specialist found no clear explanation for the claimant's
> subjective complaints of pain during an examination in September 2003. (T. 17).

     Having reviewed the record, this Court is satisfied that the ALJ utilized the proper legal

standards in his analysis of plaintiff's complaints of pain.  Further, the Court finds that there is

substantial evidence to support the ALJ's decision to discredit plaintiff's complaints of disabling

pain.  The ALJ referenced plaintiff's testimony regarding her daily activities and abilities.  (T.

17).  In addition to the testimony cited by the ALJ, plaintiff further stated that she   could put

clothes in the laundry/washer; mow the lawn; dust; eat at a restaurant; play cards; wash dishes

and sweep. (T. 251-254).

While Plaintiff claimed side effects from her medications, including dizziness, nausea and weight gain, the ALJ properly noted there was no information in her medical records that she raised these concerns with her physicians. *See Martin v. Barnhart*, 2008 WL 365727, at *5 (N.D.N.Y. 2008) (no information was contained in the plaintiff's medical evidence that she reported to her physicians, including State agency examining physician extreme, fatigue as a side effect of her medications). Further, with regard to plaintiff's subjective complaints of back pain, the ALJ noted that plaintiff's treating physician had "no explanation" for the complaints. *See Pareja v. Barnhart*, 2004 WL 626176, at *10 (S.D.N.Y. 2004) (plaintiff's complaints of pain contradicted by medical opinions of reviewing and treating physicians). The ALJ also made note of plaintiff's lack of medical treatment for her complaints of depression. (T. 17).

The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of consistent and disabling pain. The ALJ adequately specified the reasons for discrediting plaintiff's statements. Further, the ALJ's decision to reject such complaints are supported by substantial evidence. Accordingly, plaintiff's argument is without merit.

**E.     Past Relevant Work**

Plaintiff contends that the ALJ erroneously concluded that plaintiff could perform her past relevant work. (Dkt. No. 11, p. 22). Specifically, plaintiff argues that the ALJ failed to consider the impact of plaintiff's mental impairments on her ability to do her past relevant work. *Id*. Further, plaintiff contends that the ALJ failed to provide a precise description of plaintiff's past work. *Id*. at p. 23. Defendant argues that plaintiff bears the burden of establishing that she is unable to return to her past relevant work. (Dkt. No. 13, p. 19).

The claimant bears the burden of proof at the first four steps, i.e., through the determination of her ability to perform her past relevant work despite a severe impairment. *Batista v. Comm'r of Social Sec.*, 2004 WL 2700104, at *6 (S.D.N.Y. 2004). The burden of proof never shifts to the Secretary unless the claimant satisfies her burden at each of the first four steps. *See e.g., Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987) (burden shifts to Secretary only if evaluation proceeds to fifth step).

At step four of the evaluation process, the ALJ compares the claimant's residual functional capacity to her past relevant work. 20 CFR § 416.920(b). At this step, to establish disability, a claimant must demonstrate that her RFC was such that she was unable to perform her work either as she had actually performed it in the past or as that job function is usually performed. *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981). In order to determine whether a claimant is able to perform her past work, the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work, and compare these demands to the claimant's residual capabilities. *Kerulo v. Apfel*, 1999 WL 813350, *8 (S.D.N.Y. 1999) (citations omitted). SSR 82-62 provides that Plaintiff "is the primary source for vocational documentation, and statements by [Plaintiff] regarding past work are generally sufficient for determining skill level, exertional and nonexertional demands of such work". SSR 82-62, 1982 WL 31386 (S.S.A. 1982); *see also Guadalupe v. Barnhart*, 2005 WL 2033380, at *5-6 (S.D.N.Y. 2005).

The ALJ noted that:

The claimant testified that she worked for six or seven months in 1995 or 1996 as a telemarketer. She stated that the job required lifting no more than ten pounds, sitting for about seven hours per day, and standing about one hour per day. (T. 18).

Therefore, the ALJ found that plaintiff had the RFC to perform her past relevant work as a telemarketer. (T. 18).  The Court finds substantial evidence to support this conclusion.  As previously discussed, the ALJ properly evaluated plaintiff's mental impairments and substantial evidence exists to support the ALJ's assessment of plaintiff's RFC.  Plaintiff has failed to prove that her mental impairments prevented her from performing her past relevant work.  *See de Roman v. Barnhart*, 2003 WL 21511160, at *14-16 (S.D.N.Y. 2003).

Plaintiff also argues that the ALJ failed to adequately describe plaintiff's past relevant work.  (Dkt. No. 11, p. ).  The Court finds this argument without merit.  During the hearing, plaintiff provided testimony regarding her duties as a telemarketer. (T. 234).  Moreover, the plaintiff completed a Work History Report for the agency and provided details of her prior employment as a telemarketer. (T. 76).  Based upon plaintiff's testimony and written description of her prior employment, her past relevant work was adequately described and  consistent with the definition of "light work".

The Court notes that the *Dictionary of Occupational Titles* defines the occupation of "telemarketer" as sedentary work.[28]  However, absent limitations relating to dexterity or an inability to sit for long periods, those capable of light work are presumed capable of performing sedentary work.  20 C.F.R. § 404.1567(b); *see also Riordan v. Barnhart*,  2007 WL 1406649, at *5 (S.D.N.Y. 2007).  The record in this case contains no evidence of any such limitations.  Accordingly, the Court finds substantial evidence to support the ALJ's conclusion that plaintiff is capable of performing her past relevant work as a telemarketer.

---

[28] Sedentary work is defined by the Regulations as work which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a); *Dictionary of Occupational Titles*, Code No. 299.357-014, 1991 WL 672624.

**VI.    CONCLUSION**

Based upon the foregoing, it is hereby

**ORDERED** that the decision denying disability benefits is **AFFIRMED**; and it is further

**ORDERED** that the defendant's motion for judgment on the pleadings is **GRANTED**; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated:  September 30, 2008
          Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge